IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 25 C 2719 |
| UNITED STATES CUSTOMS AND | ) | |
| BORDER PROTECTION and UNITED | ) | |
| STATES IMMIGRATION AND | ) | |
| CUSTOMS ENFORCEMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Jacqueline Stevens, a political science professor at Northwestern University, filed this lawsuit against two federal agencies to compel responses to her requests for agency records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The defendants—Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)—have filed motions for summary judgment on the adequacy of their searches for responsive documents and the CBP's redactions from its production. Stevens has filed a cross-motion for summary judgment. For the reasons below, the Court grants in part ICE's motion as to the adequacy of its searches and CBP's motion regarding its withholding. The Court also grants in part Stevens' motion as to the adequacy of the searches and CBP's withholding pursuant to Exemption 7(E).

**Background**

CBP and ICE are components of the Department of Homeland Security (DHS), a federal law enforcement agency that, among other responsibilities, enforces immigration

law and oversees border security.  Stevens is a professor whose research concerns the deportation of U.S. citizens and government misconduct in deportation proceedings. She uses FOIA requests to obtain records on these topics.

## A.    CBP request

In March 2024, Stevens submitted to CBP a FOIA request seeking records regarding an individual named Raul Cortez-Rios.  She provided CBP with his date of birth, place of birth (Los Angeles, California), and alien registration number (A-number, an identifier assigned by DHS).  She requested:

> [A]ll system records pertaining to Mr. Cortez-Rios and all CBP correspondence within CBP as well as with other government agencies, individuals, or attorneys pertaining to Mr. Cortez-Rios, including but not limited to messages posted on cloud interfaces and email.  In addition, I am requesting the following information:
>
> 1) Records of grievances filed by Mr. Cortez-Rios, orally or in writing and under the control of CBP or its components.
>
> 2) All correspondence, notes, and other records pertaining to assertions or findings of U.S. citizenship in any medium, digital or otherwise.
>
> 3) Screen shots of all tabs for interfaces associated with databases likely to have records responsive to this request.
>
> 4) All statements, email, faxes, notes, and all other analyses and records tied to CBP investigations or findings for any deportation orders or arrests of Mr. Cortez-Rios.
>
> The time frame of this request is 1/1/2005 to the date when records are searched.

Defs.' L.R. 56.1 Stmt. ¶ 5.

In November 2024, CBP acknowledged receipt of Stevens' request and assigned it a tracking number.  At the time this lawsuit was filed, CBP had not produced any records to Stevens.

CBP's FOIA office searches CBP systems and databases for responsive records,

2

and when a FOIA request seeks "all" records, CBP typically searches for all travel and encounter records at the border. When it began searching for records, CBP understood that Cortez-Rios was a United States citizen. *See* Defs.' L.R. 56.1 Stmt., Ex. A, Howard Decl. ¶ 10. Based on this understanding, CBP determined that its Analytical Framework for Intelligence (AFI) system was likely to contain responsive records. A search of AFI for Cortez-Rios's name, date of birth, and A-number yielded no responsive CBP records, though ICE records in the AFI system suggested that Cortez-Rios was not a United States citizen.

In July 2025—after this lawsuit was filed—defense counsel explained that CBP had not found responsive records and asked Stevens' counsel by email if Stevens had a specific reason for believing Cortez-Rios had an encounter with CBP. Stevens's counsel responded that Cortez-Rios encountered CBP in 2011 at the Calexico Port of Entry and was recommended for expedited removal.

Based on the ICE records from the AFI search and perhaps this exchange with Stevens' counsel, CBP determined that its E3/Enforce system, which contains data on non-citizens, was reasonably likely to contain responsive records. CBP searched E3/Enforce for Cortez-Rios's name, date of birth, and A-number. It found one responsive record: an I-213 form from a 2011 encounter between Cortez-Rios and CBP at the Calexico Port of Entry. CBP staff also searched the Calexico Port of Entry for physical records related to the 2011 encounter. It did not find responsive records.

In July 2025, CBP produced the seven-page I-213 form, with redactions of CBP officer names, as well as certain other facts related to Cortez-Rios's encounter with CBP.

3

Stevens says that she obtained hundreds of pages of CBP records regarding Cortez-Rios from another source.  Stevens provides little detail on the origin of these other records, not even specifying whether the records originated with other government agencies.  *See* Pl.'s L.R. 56.1 Stmt., Ex. A, Stevens Decl. ¶ 13 ("After I submitted my FOIA request to CBP, I obtained from other sources over 100 pages of CBP records that are responsive to my FOIA request and nonduplicative of those CBP produced in this litigation.").  These records included a criminal complaint charging "Raul Cortes-Rios" with illegal reentry under 8 U.S.C. § 1326, a 2018 order dismissing the complaint, and an unredacted I-213 form.  Stevens contends that these documents should have been produced by CBP.

**B.    ICE request**

In February 2024, Stevens submitted a FOIA request to ICE regarding Cortez-Rios.  Her request to ICE, like the one she later made to CBP, stated that Cortez-Rios was born in Los Angeles and provided his A-number and date of birth.  Stevens requested:

> [A]ll system and other records maintained, produced, or distributed by ICE pertaining to Raul Cortez-Rios. . . . and all ICE correspondence within ICE as well as with other government agencies, individuals, or attorneys pertaining to Mr. Cortez-Rios.
>
> Please include as well:
>
> 1) All records of all grievances filed by Mr. Cortez-Rios, orally or in writing and under the control of ICE or its components, including county jails or private prisons with which ICE has contracted.
>
> 2) Commissary account data, including but not limited to information tracking funds reimbursed to Mr. Cortez-Rios on release from custody.
>
> 3) Work program participation documents and payment records.
>
> 4) All correspondence, notes, and other records pertaining to assertions or

findings of U.S. citizenship in any medium, digital or otherwise.

5) Communications with police, jails, prisons about Mr. Cortez- Rios's arrest and detention.

6) Screenshots of all tabs for interfaces and records tied to ICE investigations or findings for any deportation orders or arrests of Mr. Cortez-Rios[.]

7) All email, faxes, notes, and all other analyses and records tied to ICE investigations or findings for any deportation orders or arrests of Mr. Cortez-Rios[.]

Defs.' L.R. 56.1 Stmt. ¶ 32.

In September 2024, ICE informed Stevens that it did not locate any responsive records. Stevens administratively appealed, and ICE's Office of the Principal Legal Advisor (OPLA) remanded the case to the ICE FOIA office. The FOIA office directed searches of several offices that were reasonably likely to contain responsive records: the Office of Homeland Security Investigations (HSI), the Office of Enforcement and Removal Operations (ERO), the office of the Special Agent in Charge that oversaw the investigation into Cortez-Rios, the National Security Division at ICE headquarters, and the Office of the Chief Information Officer (OCIO).

From its search of HSI, ICE produced forty pages of responsive records and a screenshot from its Investigative Case Management System (ICMS). The agent assigned to the Cortez-Rios investigation at the ICE Los Angeles office was also directed to search for emails in his personal account, and two pages of emails were produced. ICE produced ten pages of responsive records from ERO. OCIO, which searched for emails from the deportation officers who processed Cortez-Rios during encounters in 2006, 2007, 2011, and 2015, did not locate responsive records. As with CBP, Stevens says that she received ICE records from other sources that were

responsive to her request but were not produced by ICE. Again, Stevens is vague regarding the provenance of these other records. *See* Stevens Decl. ¶ 34 ("After I submitted my FOIA request to ICE, I obtained from other sources several ICE records that are responsive to my FOIA request and nonduplicative of those ICE produced in this litigation."). She does say, however, that some of these records, such as a delayed birth certificate for Cortez-Rios, were from "another federal government agency[.]" *Id.* ¶ 35.

**C.      Procedural history**

In 2025, Stevens filed this lawsuit asserting claims under the FOIA and the Privacy Act, 5 U.S.C. 552a, against the Department of the Army and the U.S. Army Corps of Engineers, in addition to CBP and ICE. The Court severed the claims against the Army and the Corps of Engineers, which were unrelated to the other claims, and those proceeded in a separate lawsuit.

In February 2026, CBP and ICE moved for summary judgment on the adequacy of their searches and the appropriateness of their withholdings. Stevens contested both issues in a cross-motion for summary judgment filed in March 2026.

In April 2026, after both parties had moved for summary judgment but before briefing was complete, ICE tasked OPLA with a search of its PLAnet platform for Cortez-Rios's A-number. ICE produced two pages of responsive records with redactions.

**Discussion**

FOIA's fundamental purpose is to provide public access to government documents, "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to

6

the governed." *Rubman v. USCIS*, 800 F.3d 381, 386 (7th Cir. 2015) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "Toward that end, FOIA provides that agencies 'shall make . . . records promptly available to any person' who submits a request that '(i) reasonably describes such records and (ii) is made in accordance with [the agency's] published rules[,]'" subject to enumerated exceptions. *Id.* (quoting 5 U.S.C. § 552(a)(3)(A)). The Act is interpreted in favor of disclosure. *Id.*

## A.    Adequacy of searches

To prevail on summary judgment, an agency "must show that there is no genuine issue of material fact about the adequacy of its records search." *Id.* at 387. An agency's search for records "is adequate if it is the result of 'a good faith effort' and is also 'reasonable in light of the request.'" *Stevens v. U.S. Dep't of State*, 20 F.4th 337, 342 (7th Cir. 2021) (quoting *Rubman*, 800 F.3d at 387). The agency may meet its burden by showing "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Rubman*, 800 F.3d at 387 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

As evidence, the agency may rely on a "reasonably detailed nonconclusory affidavit[]." *Id.* (quoting *In re Wade*, 969 F.2d 241, 249 n.11 (7th Cir. 1992)). The affidavit must set forth enough information "to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *Id.* (quoting *Oglesby*, 920 F.2d at 68). That usually entails "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (quoting *Oglesby*, 920 F.2d at 68). An affidavit that

7

meets these criteria is entitled to a presumption of good faith. *See White v. U.S. Dep't of Just.*, 16 F.4th 539, 544 (7th Cir. 2021); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

The FOIA requester may rebut the affidavit with "'countervailing evidence' as to the adequacy of the agency's search." *Rubman*, 800 F.3d at 387 (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003)). "Once both parties have made their case, 'if a review of the record raises substantial doubt [about the adequacy of the search], . . . summary judgment [in the agency's favor] is inappropriate." *Id.* (quoting *Iturralde*, 315 F.3d at 314). The question a court must decide is "whether the search was performed reasonably and in good faith," not "whether the agency *might* have additional, unidentified responsive documents in its possession." *Id.* The focus on methodology means that an agency need not actually find and produce every responsive document; rather, the agency's affidavit must demonstrate that it searched all locations reasonably likely to contain responsive records. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011).

The Court begins with a threshold issue: Stevens' argument that the Court should not afford agencies a presumption of good faith. She contends that the FOIA does not mention a presumption of good faith; that the presumption undermines the purpose of the statute; and that *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), requires careful scrutiny of an agency's affidavit regarding a FOIA request. These arguments do not hold water. Although FOIA does not explicitly prescribe a presumption of good faith, the Seventh Circuit requires such a presumption when an

agency's affidavit is adequately detailed and nonconclusory, *see Stevens*, 20 F.4th at 342, and Stevens has not identified contrary authority.  Stevens argued in that case that agencies should not benefit from a presumption of good faith.  *See id.*  The Seventh Circuit disagreed, explaining that the rule is "well settled" with "good reasons[,]" namely, that "administrative regularity is the baseline assumption throughout our law, FOIA included."  *Id.* at 342–43.

The Supreme Court's intervening decision in *Loper Bright* did not alter the reasoning behind the presumption of good faith.  *Loper Bright* addressed judicial deference to statutory interpretation by administrative agencies under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  The Supreme Court overruled *Chevron* deference as incompatible with the Administrative Procedure Act's requirement for judicial review.  *See Loper Bright*, 603 U.S. at 399.  But it said nothing regarding administrative regularity at large or in FOIA litigation.

Although Stevens' broader challenge to the presumption of good faith fails, the Court evaluates each agency affidavit in turn.

### 1.  CBP

CBP contends that summary judgment in its favor is warranted because it conducted adequate searches for responsive records in all places reasonably calculated to recover responsive documents.  CBP's affidavit from Patrick Howard, the Branch Chief of the CBP FOIA Division, describes how the agency conducted two searches to fulfill Stevens' request.  First, on the understanding that Cortez-Rios was a United States citizen, Howard Decl. ¶ 10, CBP searched for Cortez-Rios's name, date of birth, and A-number in the AFI system, which "pulls information from a wide array of systems, including CBP's Automated Targeting System, Advance Passenger

9

Information System, TECS, Electronic System for Travel Authorizations, Border Crossing Information, Nonimmigrant and Immigrant Information System, Seized Asset Case Tracking System, and more." Def.'s L.R. 56.1(b)(3) Stmt., Ex. C, Howard Suppl. Decl. ¶ 5. No responsive records were found. But ICE records, which CBP was not required to produce, suggested that Cortez-Rios was not a United States citizen. *See Stevens v. U.S. Dep't of Homeland Sec.*, No. 13 C 3382, 2014 WL 5796429, at *8 (N.D. Ill. Nov. 4, 2014) (noting that DHS, rather than its components, has the responsibility to respond to FOIA requests, so one component of DHS need not respond when another component has done so). CBP thus searched for the same terms in the E3/Enforce system, which contains biographic, biometric, and encounter information on non-citizens. The E3/Enforce search yielded one responsive record: an I-213 form from a 2011 encounter between Cortez-Rios and CBP at the Calexico Port of Entry. CBP staff also looked for physical records at the Calexico Port of Entry but found none.

Howard's affidavit is a "reasonably detailed nonconclusory affidavit[]." *Rubman*, 800 F.3d at 387. He provides the search terms used in each database and explains why each database was searched. And the affidavit reflects that the agency "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* (quoting *Oglesby*, 920 F.2d at 68). The agency recognized uncertainty around the citizenship status of Cortez-Rios and made efforts to ensure it would locate records whether he was a citizen or not. Howard "aver[red] that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (quoting *Oglesby*, 920 F.2d at 68); *see* Howard Decl. ¶ 20. The affidavit is entitled to a presumption of good faith.

10

Stevens argues that CBP's search was inadequate for several reasons. First, she cites Howard's declarations in other FOIA cases stating that, for a U.S. citizen, the TECS platform was reasonably likely to contain responsive records. *See* Pl.'s Resp. to Defs.' L.R. 56.1 Stmt., Ex. 5 (providing excerpts from Howard's declarations in various FOIA cases related to claims of U.S. citizenship). Stevens noted that Howard's declaration in this case did not reference TECS or explain why it was not searched. But Howard's supplemental declaration makes clear that TECS *was* searched; it is included in AFI, which the agency searched. *See* Howard Suppl. Decl. ¶ 5. Stevens goes on to argue that Howard's declaration was inadequate because it doesn't explain whether AFI contains all TECS records or only summary-level outputs. In this regard, she refers to "the summary level outputs that CBP produced in this case." Pl.'s Cross-Reply at 3. But CBP did not produce any records from AFI or TECS regarding Cortez-Rios in this case, so the Court does not see a basis for Stevens' contention that AFI pulls only summaries from TECS. Howard does not specifically address this point. But, as indicated, his supplemental affidavit makes clear that CBP searched AFI, which contains records from TECS. That suffices to carry the agency's burden.

Next, Stevens appears to assert that CBP assumed that Cortez-Rios was a U.S. citizen and accordingly limited its search. Stevens overlooks the plain text of Howard's affidavit, which specifies that CBP performed two searches, first seeking responsive records for Cortez-Rios as a citizen and then as a noncitizen. CBP has already conducted the search Stevens seeks, namely a database search for records of noncitizens.

CBP also understands Stevens as objecting to the sequence of its searches. But

11

it was reasonable for CBP to first search the AFI based on its understanding from Stevens' own FOIA request that Cortez-Rios was a U.S. citizen and then, upon encountering conflicting information, to search the E3/Enforce database. CBP demonstrated good faith by conducting iterative searches as its understanding of Cortez-Rios's status evolved. The sequence of the searches is immaterial.

Stevens also contends that CBP's search was inadequate because she obtained hundreds of pages of CBP records relating to Cortez-Rios from another source, which she does not identify. If the agency searched all locations reasonably likely to contain responsive records, the existence of other potentially responsive records does not preclude summary judgment. *Rubman*, 800 F.3d at 387. "[I]t is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate." *Iturralde*, 315 F.3d at 315. "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search. After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." *Id.* (citation omitted).

Stevens provides two examples of documents she contends CBP should have produced. First, she points to a TECS record stating that Raul Cortez-Rios was arrested by ICE Bakersfield in August 2011 and charged with re-entry after deportation. Pl.'s L.R. 56.1 Stmt., Ex. A-1. But this document is an ICE record, not a CBP record. Howard Suppl. Decl. ¶ 7. CBP had no obligation to produce ICE records, and there is no basis to believe that this ICE record was also contained in CBP's records.

Stevens' second example is a one-page criminal complaint charging "Raul

12

Cortes-Rios" under 8 U.S.C. § 1326 with illegal reentry into the United States in October 2011. Pl.'s L.R. 56.1 Stmt., Ex. A-2. This document is signed by a CBP enforcement officer as well as a magistrate judge. It does not contain a date of birth or an A-number, nor does it spell Cortez-Rios's last name in the same way as Stevens' FOIA request. Aside from these reasons why the document would not have turned up in CBP's search, CBP provides an affidavit from Richard Rothblatt, an Assistant United States Attorney (AUSA), explaining that the one-page complaint "could have been drafted in the [AUSA]'s [o]ffice, reviewed by the law enforcement official at the United States Attorney's Office, signed in the judge's presence, and retained by court staff and the United States Attorney's Office, without ever having been sent to, possessed, or retained by the signatory agent." Defs.' L.R. 56.1(b)(3) Stmt., Ex. D, Rothblatt Decl. ¶ 6. In other words, there is a good basis to believe that the criminal complaint may never have been in CBP's files. This practice was "particularly common" prior to the COVID-19 pandemic for "short and simple complaints, including, but not limited to, one-page removal affidavits." *Id.* ¶ 4. Although Rothblatt is not an AUSA in the district where the criminal complaint against Cortez-Rios (or Cortes-Rios) was filed, he provides a reasonable explanation for why the document might not be in CBP's system.

In sum, CBP has adequately explained why these documents were not produced. And Stevens does not provide other examples of the "hundreds of pages" she says she obtained that might shed further light on the adequacy of CBP's search. Pl.'s Mem. in Supp. of Cross-Mot. for Summ. J. at 8. Her citation to documents she received relating to other individuals who were deported but claimed U.S. citizenship is unavailing, as the Court cannot assess a reasonable search in this case based on the

records provided in response to FOIA requests involving other subjects.

The I-213 form, TECS production, and the criminal complaint do, however, cast doubt on the adequacy of CBP's search for another reason: they spell Cortez-Rios's last name "Cortes-Rios," although the TECS report uses both spellings. *See* Pl.'s L.R. 56.1 Stmt., Exs. A-1–A-2; Def.'s L.R. 56.1 Stmt., Ex. A-1. The I-213 form also includes Cortez-Rios's date of birth and A-number, but the other documents do not. That indicates a gap in CBP's search: in searching for "Cortez-Rios," his birthdate, and his A-number, CBP's search likely would not have yielded documents that lacked his birthdate and A-number and misspelled his name. The prevalence of the alternative spellings "Cortes Rios" or "Cortes-Rios" across ICE and CBP records suggests that a search using "Cortes Rios" (and Cortes-Rios) is reasonably necessary to locate all reasonably responsive records. Thus, although Stevens has not "raise[d] substantial doubt" about the adequacy of the search through most of her arguments, summary judgment for CBP is not appropriate in this particular respect. *Rubman*, 800 F.3d at 387 (quoting *Iturralde*, 315 F.3d at 314). CBP must conduct another search of the AFI and E3/Enforce databases using the common spelling variations of Cortez-Rios's name, "Raul Cortes-Rios," "Raul Cortes Rios," and "Raul Cortez Rios," both on their own and with his A-number. The Court grants Stevens's motion for summary judgment to this extent.

### 2. ICE

To assess the adequacy of ICE's search, the Court begins with the agency's affidavit from Megan Davis, the Deputy Director of the ICE FOIA Office. HSI (again, the Office of Homeland Security Investigations) searched ICMS, its "core law enforcement

case management tool[,]" using Cortez-Rios's full name and A-number as separate search terms. Defs.' L.R. 56.1 Stmt. ¶ 45; *Id.*, Ex. B, Davis Decl. ¶ 28. The search yielded forty-two pages of records. Davis Decl. ¶ 28. ICE produced forty of these pages and referred two pages to the Transportation Security Administration for review. The office of the Special Agent in Charge that oversaw the investigation into Cortez-Rios and the National Security Division at ICE headquarters searched for the terms "Raul Cortez-Rios," "Raul Cortez Rios," and Cortez-Rios's nine-digit A-number, with and without hyphens, and found the same forty-two pages of records. *Id.* ¶ 30. Two pages of emails were also produced after a search of the same terms in the personal email account of the agent assigned to the Cortez-Rios investigation at the ICE Los Angeles office. *Id.* ¶ 33. ICE additionally produced a screenshot from ICMS, which Stevens had requested.

Turning to ERO (again, the Office of Enforcement and Removal Operations), ICE searched the ERO database with Cortez-Rios's name, A-number, and date of birth, which produced ten pages of responsive records. *Id.* ¶ 40. As the ERO search showed that Cortez-Rios had once been detained for over twenty-four hours, ICE tasked the private company administering the facility and the field office overseeing the facility with searching for records. Neither had, or had retained, any records from Cortez-Rios's detention.

ICE also tasked OCIO (the Office of the Chief Information Officer) to search for emails from the deportation officers who processed Cortez-Rios during encounters in 2006, 2007, 2011, and 2015. The search terms were "(1) the full names of the two listed deportation officers on the record, and (2) the name of the alien: Raul Cortes-

15

Rios, including his alien number." *Id.* ¶ 52. No emails could be accessed from the 2006 or 2007 periods. No responsive records were found relating to the 2011 encounters. ERO concluded that no emails from the 2015 encounter were likely to exist as the detention was less than twenty-four hours, no deportation officers had been assigned, and the encounter took place over ten years ago, so ERO could not trace which deportation officers had been assigned.

ICE also tasked its Office of Professional Responsibility (OPR) with a search of its records related to potentially responsive grievances. OPR responded that it does not handle facility-related grievances and instead investigates complaints of employee misconduct, which ICE understood to be outside the scope of Stevens' request.

Davis states in her affidavit that "all locations likely to contain records responsive to Plaintiff's FOIA Request (to the extent that they exist within ICE's custody) were searched." *Id.* ¶ 20. Additionally, agency counsel has engaged with Stevens's counsel by email and ICE has conducted searches that seem to have been prompted by Stevens's motion for summary judgment. *See Stevens*, 20 F.4th at 343 (noting as indicative of good faith that agency "produced hundreds of documents over the course of four years of negotiation and engagement with Professor Stevens").

In her cross-motion for summary judgment, Stevens asserted that it was unreasonable for ICE not to search for records from OPLA (again, the Office of the Principal Legal Advisor), which utilizes a case and document management system called PLAnet. In April 2026, while this lawsuit was pending, ICE tasked OPLA with searching PLAnet for Cortez-Rios's A-number. *See* Def.'s L.R. 56.1(b)(3) Stmt., Ex. F, Clark Decl. ¶ 15. ICE then produced two pages of responsive records. Stevens seeks

summary judgment on the basis that ICE's initial search, which did not include PLAnet, was inadequate; ICE still maintains that the follow-up search was not legally required. But the distinction between ICE voluntarily conducting this search and conceding that the search is legally required matters little in practice and with respect to potential remedies. That aside, there is no need for the Court to now order ICE to conduct a search it has already performed.

Stevens also argues that the PLAnet search was inadequate, as the agency's affiant, Kenneth Clark, the Assistant Director of the Office of Information Governance and Privacy, did not attest that the two pages produced were the only responsive records. Based on a PLAnet production she received in response to a FOIA request about a different individual, Stevens suggests that the PLAnet entry on Cortez-Rios may reference documents or memoranda, which ICE has not produced. But ICE did not have an opportunity to respond to this suggestion, which Stevens made for the first time in the reply brief on her cross-motion. The Court will give ICE an opportunity to do so in the Conclusion at the end of this opinion.

Stevens next objects to the search terms used by OCIO to search for emails relating to Cortez-Rios. Davis described the terms as "(1) the full names of the two listed deportation officers on the record, and (2) the name of the alien: Raul Cortes-Rios, including his alien number." Davis Decl. ¶ 52. Davis's affidavit misspells Cortez-Rios's last name. It is not clear to the Court whether this means that ICE searched for emails using this misspelling or simply that the affidavit contains a typo.

An agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry. Consequently, the court

evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998). Stevens has shown that Cortez-Rios's name was regularly misspelled—or at least regularly given an alternate spelling—in CBP and ICE records. ICE responds that it "*did* search using Cortez-Rios's alien number, which would capture records regardless of how his name was spelled on a particular record." Def.'s Reply at 7. That statement, however, is at odds with Davis's declaration. Davis stated that ICE performed searches with both Cortez-Rios's A-number *and* his name, and if one takes that literally ("and," not "or"), a search would have yielded only records with his name spelled that way, not records with his correct A-number and the spelling "Cortes-Rios." If ICE did indeed search for Cortez-Rios's A-number alone, without his name, that would seem reasonably likely to locate responsive records. Because it does not appear that ICE has done so, however, it must direct OCIO to search within emails related to the 2011 encounters for Cortez-Rios's A-number alone. ICE must also search for each spelling variations of Cortez-Rios's name, "Raul Cortez-Rios," "Raul Cortez Rios," "Raul Cortes-Rios," and "Raul Cortes Rios," both on their own and with his A-number.

Stevens' final objection related to the emails is that ICE may have lost access to emails from the 2015 encounter by not promptly searching for emails upon receiving Stevens' FOIA request. That is certainly within the realm of possibility. But ICE provided additional reasons that a search for these emails would not have yielded responsive records, as no deportation officer was assigned and the encounter with Cortez-Rios lasted less than twenty-four hours. Stevens objects that ICE does not

18

adequately explain why an encounter of less than twenty-four hours is unlikely to create email records. But Davis's declaration states that it is unlikely that email records would exist for a brief encounter in which Cortez-Rios was taken into custody from a prison and put directly onto a removal flight. Davis Decl. ¶ 42. Stevens presents no reason to doubt this assertion other than her own statement that "ICE regularly generates information about people . . . in ICE custody for less than 24 hours." Stevens Decl. ¶ 33. But Stevens does not claim, and offers no evidence, that *emails*—which is what we are talking about here—are likely to have been created during Cortez-Rios's brief encounter with ICE before being put onto an airplane. And she offers nothing to rebut ICE's contention that emails are unlikely to exist when no deportation officer was assigned and during a less than twenty-four-hour period of custody. Davis's declaration provides sufficient detail on why ICE did not search for emails relating to the 2015 encounter.

Stevens more broadly asserts that Davis's declaration is inadequate because it lacks important information regarding ICE emails. She contends that Davis does not adequately detail how the emails of ICE officers are stored or archived. But Davis's declaration is quite clear in describing which emails OCIO is able to access: emails from July 2018 to the present are retrievable; emails from 2009 to July 2018 may be accessible; and no retrieval is possible for email data preceding 2009. Davis Decl. ¶ 50. ICE ERO cannot access electronic communication over ten years old. *Id.* ¶ 46. The ability of OCIO and ERO to access emails is a different question from whether an employee has archived an email, which is described in a separate portion of the declaration. *Id.* ¶¶ 15–16. Based on the declaration, archiving, exporting, or deleting

19

emails does not affect their retrievability. Clark Decl. ¶ 19. Stevens seeks information on whether ICE can search an employee's ICE email account without the participation of the employee, but nowhere does Davis suggest that employees are involved in these searches, other than in searches of a personal email account, which ICE understandably cannot undertake without an employee's consent.

Finally, Stevens argues that ICE failed to produce records that she received from sources she does not identify, indicating that ICE's search was inadequate. Again, "the failure of an agency to turn up one specific document in its search does not alone render a search inadequate." *Iturralde*, 315 F.3d at 315. Stevens points to two documents: 1) a 2015 letter from an attorney representing Cortez-Rios and referencing an enclosed U.S. birth certificate and 2) an I-213 form. ICE responds that the I-213 form was signed by a CBP officer and therefore is a CBP record, which is consistent with the fact that CBP produced the I-213 to Stevens. As for the attorney letter, the fact that there is a document regarding Cortez-Rios that was not produced does not render ICE's search unreasonable. The Court must focus on ICE's methodology, which appears reasonably calculated to yield all responsive records, with the exception of the concern regarding emails noted above. The result might be different if Stevens had identified a distinct database that ICE should have searched or a search term that ICE should have used. *See id.* (noting that plaintiff did not assert that agency "failed to search particular offices or files").

In summary, ICE has prevailed in demonstrating a lack of genuine disputes of material fact regarding its searches of HSI and ERO. But Stevens has demonstrated a genuine dispute as to the adequacy of ICE's search for emails from the 2011 encounter,

and ICE must search for Cortez-Rios's A-number alone and with each spelling or misspelling of his name: Raul Cortes-Rios, Raul Cortez-Rios, Raul Cortes Rios, and Raul Cortez Rios. The Court will additionally afford ICE the opportunity to submit a supplement on the issue of the PLAnet search referenced earlier.

**B.     FOIA exemptions**

FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011). "Disclosure is required unless the requested record is clearly exempted from disclosure by the statute." *Enviro Tech Int'l, Inc. v. U.S. Envtl. Prot. Agency*, 371 F.3d 370, 374 (7th Cir. 2004). The agency claiming the exemption bears the burden of establishing by a preponderance of the evidence that the exemption applies. *Id.* The "withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" *King v. U.S. Dep't of Just.*, 830 F.2d 210, 224 (D.C. Cir. 1987) (quoting *Mead Data Cent. v. U.S Dep't of the Air Force,* 566 F.2d 242 (D.C. Cir. 1977)).

Stevens argues that CBP improperly withheld information under FOIA Exemptions 6, 7(C), and 7(E). Exemption 6 allows withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) permits withholding of "records or information compiled for law enforcement purposes" where release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Although similar, "Exemption 7(C) is more

21

protective of privacy than Exemption 6[.]" *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994). Exemption 7 applies to disclosures that "could reasonably be expected to constitute an unwarranted invasion" of privacy, and Exemption 6 applies only to "clearly unwarranted invasion[s]" of privacy. 5 U.S.C. §§ 552(b)(6), (7)(C). Stevens does not dispute that CBP is a law enforcement agency or that Cortez-Rios's I-213 was compiled for law enforcement purposes, meaning that CBP need "satisfy only the lower withholding standard contained in Exemption 7(C)." *Stevens*, 2014 WL 5796429, at *6.

To assess whether disclosing the redacted information "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), a court must weigh the third parties' private interest in the nondisclosure of the information at issue against "the only relevant public interest in the FOIA balancing analysis—the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Fed. Lab. Rels. Auth.*, 510 U.S. at 497 (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)).

The CBP production of Cortez-Rios's I-213 form, which was submitted in full to the Court, labels the redacted material with the corresponding FOIA exemptions. The portions labeled with Exemptions 6 and 7(C) appear to include the names and contact information of CBP officers and a Duty United States Attorney, a birthdate listed on a visa used by Cortez-Rios, and phone and fax numbers for government parties. Howard's declaration explains that "Exemption 6 was invoked to withhold identifying information in records related to CBP employees and third party individuals who did not

provide consent for release."  Howard Decl. ¶ 23.  "Exemption 7(C) was invoked to protect the names of government employees and third parties."  *Id.* ¶ 25.  He notes that job titles were not redacted and cites general concerns of harassment of employees.

Stevens does not explain any public interest in disclosures of the names of the particular CBP officers or Duty United States Attorney who dealt with Cortez-Rios's case or in disclosure of the birthdate on Cortez-Rios's visa.  She has not provided a basis for a reasonable factfinder to conclude that disclosure "would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Fed. Lab. Rels. Auth.*, 510 U.S. at 497 (quoting *Reps. Comm. for Freedom of Press*, 489 U.S. at 773).  Stevens therefore cannot show a benefit that outweighs the third parties' privacy interests.  Indeed, "personal identifying information is regularly exempt from [FOIA] disclosure."  *Lakin L. Firm, P.C. v. FTC.*, 352 F.3d 1122, 1124 (7th Cir. 2003); *Becker v. IRS*, 34 F.3d 398, 404 (7th Cir. 1994) (concluding that the plaintiffs had failed to advance any public interest in disclosure of IRS employee names).

Stevens says that CBP failed to provide a *Vaughn* index or a separate justification for each specific redaction.  *See Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973).  "A *Vaughn* index is a comprehensive listing of each withheld document cross-referenced with the FOIA exemption that the Government asserts is applicable." *Libarov v. USCIS*, 138 F.4th 1010, 1013 n.1 (7th Cir. 2025) (quoting *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1036 n.3 (7th Cir. 1998)).  But "[t]here is no *per se* rule requiring the filing of a *Vaughn* index in FOIA cases; determination of whether to compel a *Vaughn* index requires a case-by-case analysis of the information produced by the agency in response to a FOIA request."  *Kozacky & Weitzel, P.C. v. IRS*, No. 07

C 2246, 2008 WL 2188457, at *3 (N.D. Ill. Apr. 10, 2008) (Kennelly, J.). No *Vaughn* index was needed here because CBP's affidavits "provide sufficient information to allow a court to review the agency's claimed exemption." *Wright v. OSHA,* 822 F.2d 642, 646 (7th Cir. 1987). The small quantity of records involved—seven pages—also renders a *Vaughn* index unnecessary. In sum, CBP has met its burden of establishing that there is no genuine dispute that Exemptions 6 and 7(C) justify its redactions.

Stevens also objects to CBP redactions made under Exemption 7(E), which exempts from disclosure records "compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552 (b)(7)(E). "Exemption 7(E) sets a relatively low bar for the agency to justify withholding[.]" *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* (quoting *Mayer Brown LLP v. IRS,* 562 F.3d 1190, 1193 (D.C. Cir. 2009)). Exemption 7(E) permits withholding "not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193.

CBP withheld the following information from Cortez-Rios's I-213 under Exemption 7(E): the list of records checked by CBP officers, the lane of the Calexico Port of Entry

24

through which Cortez-Rios presented himself, and the machine in which his fingerprints were run, as well as government witness names and contact information already discussed under Exemptions 6 and 7(C), which the Court therefore does not analyze again. The Court cannot ascertain the general nature of the content of one redaction that covers two lines in the narrative portion of the form, although it may relate to the fingerprinting, which is discussed in the prior sentence.

Howard's declaration states that Exemption 7(E) "was invoked to protect non-public and sensitive information regarding CBP inspectional activities. Such techniques, procedures, and investigations have been redacted, as disclosure may enable visitors to circumvent the law and/or disrupt CBP's inspectional activities." Howard Decl. ¶ 27. That statement essentially restates Exemption 7(E) without providing the Court insight into *how* the redacted information logically fulfills the Exemption, as done with much greater specificity in other cases. *See, e.g.*, *Henderson Parks, LLC v. Fed. Bureau of Prisons*, No. 23 C 13762, 2024 WL 1834150, at *7 (N.D. Ill. Apr. 26, 2024) (holding that the Bureau of Prisons properly invoked Exemption 7(E) with specific information about how disclosure of information regarding prisoners, safety incidents, and gangs could jeopardize institutional order and safety); *Boundaoui v. FBI*, No. 17 C 4782, 2024 WL 2019532, at *6 (N.D. Ill. May 3, 2024) (holding that FBI properly invoked Exemption 7(E) by describing for each of seventeen categories "how disclosure would give criminals insight into investigation techniques and would logically aid criminals in circumventing the law"). It is particularly unclear how disclosure of the lane through which Cortez-Rios entered the Calexico Port of Entry could create a risk of illegal activity. Although the agency need only show some chance of a reasonably expected risk of circumvention of

25

the law, it hasn't done so here.  Additionally, the Court has no basis to ascertain the nature of the redacted information in the narrative section.  To better understand the redacted material, the Court directs CBP to submit an unredacted version of the I-213 form for *in camera* review.  *See Higgs v. U.S. Park Police*, 933 F.3d 897, 906 (7th Cir. 2019) (noting that court could have conducted *in camera* review of documents to "ensure that the exemption has properly been invoked"); *see* 5 U.S.C. § 552(a)(4)(B) (permitting *in camera* review).

Lastly, FOIA requires an agency to disclose any "reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b)(9). "[A]n agency is entitled to the presumption that it complied with its obligation to disclose all reasonably segregable material[.]"  *Stevens*, 2014 WL 5796429, at *10 (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).  Stevens does not argue that CBP failed to disclose reasonably segregable material, so the Court agrees that CBP has satisfied this obligation.

Stevens originally contested only CBP's redactions.  After ICE's April 2026 production of records from PLAnet, however, Stevens challenged redactions by ICE, noting that ICE submitted no affidavit to support its withholdings from those records. The issue is not fully briefed, as the production occurred on April 8, in the midst of summary judgment briefing.  Although ICE filed a reply on April 10 and Stevens filed a cross-reply on April 24, ICE has not had the chance to respond and perhaps submit a supplemental affidavit.  The Court reserves ruling on the ICE withholdings until further briefing is complete.

**C.      Discovery**

Stevens asks the Court to permit discovery, including depositions of relevant agency officials, to better assess the question of bad faith by agency officials and the proper search terms and methods that would produce additional records responsive to her FOIA requests.  "[T]he district court 'has broad discretion to manage the scope of discovery in FOIA cases.'"  *Fams. for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 331, 336 (S.D.N.Y. 2011).  Stevens asserts that the agencies' declarations are "plainly insufficient" and that she has "made a sufficient showing of bad faith[.]"  Pl.'s Mem. in Supp. of Cross-Mot. for Summ. J. at 14.  Neither contention is accurate.  The Court has required both CBP and ICE to conduct additional searches, and it has ordered supplemental briefing from ICE and Stevens.  It will also conduct *in camera* review of CBP records.  Amidst that activity, and with no indication of bad faith on the part of either agency, discovery is not necessary or appropriate at this time.

### Conclusion

In conclusion:  (a) The Court partially grants ICE and CBP's motion for summary judgment [dkt. 39], with respect to the adequacy of ICE's search of HSI and ERO records, as well as the propriety of CBP's withholdings under Exemptions 6 and 7(C). (b) The Court also partially grants Stevens's cross-motion for summary judgment [dkt. 42] with respect to the inadequacy of CBP's search, the inadequacy of ICE's search for emails related to the 2011 encounter, and CBP's withholdings under Exemption 7(E). CBP and ICE must conduct a further search of their records as described in the body of this opinion by July 24, 2026 and produce any responsive documents and an index of any withholdings to Stevens by August 3, 2026.  In particular, CBP must conduct

27

searches of the AFI and E3/Enforce databases using each of the common spelling variations of Cortez-Rios's name, "Raul Cortes-Rios," "Raul Cortes Rios," and "Raul Cortez Rios," both independently and with his A-number. Regarding emails related to the 2011 encounter between Cortez-Rios and ICE, ICE must direct OCIO to search for Cortez-Rios's A-number alone and spelling variation of Cortez-Rios's name, "Raul Cortez-Rios," "Raul Cortez Rios," "Raul Cortes-Rios," and "Raul Cortes Rios," both on their own and with his A-number. (c) Additionally, by July 20, 2026, CBP must submit to the Court for *in camera* review an unredacted version of its production (the I-213 form). (d) ICE is given leave to submit by July 27, 2026 a supplemental submission of no more than five pages, as well an affidavit, regarding the adequacy of its search of PLAnet and the redaction of the PLAnet records. Stevens is given leave to file a response of no more than five pages by August 3, 2026. Neither of these deadlines will be extended for any reason. The Court defers ruling on this particular point until briefing is completed. (e) The case is set for a telephonic status hearing on August 6, 2026 at 8:55 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

MATTHEW F. KENNELLY
United States District Judge

Date: July 16, 2026

28